IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CAMILLE M. FULLER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:08-CV-539-K |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation for disposition. Before this Court are Plaintiff's *Motion for Summary Judgment* and *Brief/Memorandum in Support*, filed August 8, 2008, Commissioner's *Response to Motion*, filed September 11, 2008, Commissioner's *Motion for Summary Judgment* and *Brief /Memorandum in support of motion*, filed September 11, 2008, and Plaintiff's *Reply to Response to Motion*, filed November 7, 2008. Having reviewed the evidence of the parties in connection with the pleadings, the undersigned recommends that Plaintiff's *Motion for Summary Judgment* be **GRANTED**, Defendant's *Motion for Summary Judgment* be **DENIED,** and the case be **REMANDED** to the Commissioner for further proceedings.

**I. BACKGROUND**[1]

**A.     Procedural History**

Camille M. Fuller ("Plaintiff") seeks judicial review of a final decision by the Commissioner

---

[1] The background is taken from the transcript of the administrative proceedings, designated herein as "Tr."

- 1 -

of Social Security ("Commissioner"), denying her claim for disability benefits. Plaintiff filed an application for disability benefits under Title II and Title XVI of the Social Security Act on June 22, 2005. (Tr. at 458). Plaintiff claimed she had been disabled since January 1, 2002, due to lower back problems. (Tr. 15, 138). Her application was denied initially and upon reconsideration. (Tr. at 41, 453). Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 15). A hearing, at which Plaintiff personally appeared and testified, was held on August 16, 2007. (Tr at 490). The ALJ issued her decision on November 26, 2007 finding plaintiff not disabled. (Tr. at 15-23). The Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in Plaintiff's request for review did not provide a basis for changing the ALJ's decision. (Tr. at 5-7). Thus, the ALJ's decision became the final decision of the Commissioner. (Tr. at 5). Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on March 27, 2008.

**B.    Factual History**

    **1.    Age, Education, and Work Experience**

Plaintiff was born in 1962 and was forty-two years old at the time of the hearing. (Tr. at 106). She is a high school graduate and has not attended any special job training, trade, or vocational school. (Tr. at 143). Her past relevant work includes work performed as a general clerk, receptionist, sales-clerk, stock-clerk, ad-layout/space clerk, newspaper distributor, and baby-sitter. (Tr. at 539-40). Plaintiff last worked in 2005. (Tr. at 538).

    **2.    Medical Evidence**

Plaintiff's relevant medical history began while she was working as a stocker for Big Lots on February 8, 1999, when she experienced severe pain throughout her lower back while lifting boxes and heavy trees. (Tr. at 188). On February 10, 1999, Plaintiff saw Dr. Thomas J. Havard, D.O., who

diagnosed the problem as lumbar strain. (Tr. at 181, 188). The X-rays ordered by Dr. Havard showed that Plaintiff's vertebral bodies were intact, their inter-spaces were satisfactorily maintained, and the posterior elements were all within normal limits. (Tr. at 188, 192). Dr. Havard prescribed some medication for Plaintiff's pain and placed restrictions on her regarding lifting, pushing, pulling, sitting, and standing for extended periods of time. (Tr. at 188, 193). Dr. Havard also referred Plaintiff to K Clinic, a physical therapy center for evaluation and treatment. (Tr. at 188).

Konrad Kuenstler, P.T., in a physical therapy evaluation report dated March 4, 1999, noted that Plaintiff was experiencing some severe pain throughout her low back, frequent episodes of disturbed sleep, and occasional dizziness since the onset of injury. *Id*. Kuenstler assessed Plaintiff's condition as a somatic[2] dysfunction of the muscles, tendons and ligaments that stabilize the lumbar spine. (Tr. at 190-91). He also noted that Plaintiff's symptoms were consistent with a left posterior innominate[3] rotation. *Id*. The physical therapy treatment plan designed for Plaintiff included cold packs, electrical muscle stimulation, phonophoresis, joint mobilization, myofascial release, and muscle therapy. (Tr. at 190). On April 8, 1999, Plaintiff was discharged from the physical therapy program and transferred to the care of Dr. Glenn R. Fletch, D.C. (Tr. at 178-79, 212, 239).

On July 20, 2000, Dr. Fletch referred Plaintiff to Dr. Renaud Rodrigue, M.D. (Tr. at 432). Between September 25, 2000, and August 27, 2001, Plaintiff was seen by Dr. John H. Peloza, M.D., in consultation with Dr. Rodrigue, for persistent severe pain and tenderness in her left sacroiliac joint. (Tr. at 202-09, 239, 427). Dr. Peloza's impression was that Plaintiff's pain was due to left sacroiliitis, a left sacroiliac joint dysfunction. (Tr. at 203, 208-09). On several separate occasions, Dr. Peloza

---

[2] Affecting the entire body. *See* Medical Encyclopedia, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited Dec. 22, 2008).

[3] Relating to the hip. *See* Medical Dictionary, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited Dec. 22, 2008).

ordered anti-inflammatory medication, sacroiliac joint injections, manual therapy, prolotherapy, and left SI joint block for Plaintiff. (Tr. at 202-209). During that same time, Dr. Karl D. Erwin, M.D., conducted an evaluation of Plaintiff's condition. (Tr. at 231, 238). Dr. Erwin noted that Plaintiff was experiencing persistent severe pain which affected not only her movement but also her sleep. (Tr. at 239). He concluded that Plaintiff's pain was caused by her work-place injury and recommended analgesic medications, trigger point injections, and sacroiliac injections to relieve her pain. (Tr. at 234, 243). Plaintiff, in accordance with these recommendations, was given three sacroiliac joint injections, but only the second one seemed to help for a brief period of time. (Tr. at 430, 207).

Medical records covering the time period between November 13, 2001, and July 16, 2003, reveal that Plaintiff's condition was repeatedly assessed as sacroiliac joint pain and lumbar spondylosis[4], and that Plaintiff's "aching, burning, and throbbing pain" due to these conditions was allegedly kept under adequate but not ideal control by continued use of pain medications. (Tr. at 225-27, 384-404). Plaintiff claimed that as a result of this incomplete relief, she was limited in her functionality and mobility. (Tr. at 288). An evaluation conducted by Dr. Erwin on May 7, 2002, notes that Plaintiff attributed the tremendous aggravation in her back pain to a significant increase in stress at home. (Tr. at 225).

Plaintiff's medical records from January 15, 2004, to August 2, 2004, show that Plaintiff complained of frequent dull aching pain in her lower back and left hip to Dr. Rodrigue. (Tr. at 377-82). Her physicians continued to diagnose her problems as sacroiliac joint pain and lumbar spondylosis. *Id*. Plainitff maintained that, in general, the medication regimen was effective and her pain was under adequate control. *Id*. But, on October 12, 2004, Dr. Renaud noted that a new flare in Plaintiff's pain

---

[4] A degenerative disease of the spine. *See* Medical Dictionary, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited Dec. 22, 2008).

warranted treatment by a joint diagnostic injection and left sacroiliac joint rhizotomy.[5] (Tr. at 376). He also noted that Plaintiff had multilevel degenerative spine disease and her spine was "probably a major source of [her] complaints of pain." *Id*. On October 28, 2004, Dr. Radhika E. Ravula, M.D., performed a sacroiliac joint arthrogram on plaintiff and gave her a sacroiliac joint injection. (Tr. at 330). On November, 15, 2004, Dr. Renaud used a fluoroscopic guided needle to examine Plaintiff's spine and performed a left sacroiliac joint rhizotomy on her. (Tr. at 328). He noted an encouraging response to the procedure for a brief period of time. (Tr. at 370).

Over the next fifteen months, Plaintiff's condition continued to be diagnosed as sacroiliac joint pain and lumbar spondylosis. (Tr. at 322-65). Plaintiff generally maintained that the medication regimen was effective and that her pain was adequately controlled. (Tr. at 341-65). Only once did her pain flare to such an extent that a fluoroscopic guided needle was used to examine her spine and a left sacroiliac joint rhizotomy was performed on her. (Tr. at 359-361). Magnetic Resonance Imaging (MRI) of her lumbar spine during that time proved unremarkable. (Tr. at 352-55). One report by Dr. Robert Bulger, M.D., during that time period, noted that Waddell's signs were positive. (Tr. at 362).

On August 23, 2006, Plaintiff started complaining that her medication regimen was ineffective in adequately controlling her pain. (Tr. at 324-37). As a result of these complaints, on two separate occasions, a fluoroscopic guided needle was used to examine her spine and a left sacroiliac joint rhizotomy was performed on her. (Tr. at 324-26). Another MRI of her lumbar spine was conducted but, as previously, it proved unremarkable. (Tr. at 327). In November 2006, Plaintiff stated to Dr. Robert Bulger, M.D., that even though her pain was returning, her medications were effective in controlling that pain. (Tr. at 445). Four months later, on April 4, 2007, Plaintiff made similar remarks

---

[5] The operation of cutting the anterior or posterior spinal nerve root. *See* Medical Dictionary, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited Dec. 23, 2008).

in a visit to Dr. Rodrigue. (Tr. at 442).

Medical records from Plainitff's visit to Dr. Rodrigue on August 1, 2007, note that Plainitff was feeling an "increased burning sensation" in her lower back, her lower extremities, and her left sacroiliac joint. (Tr. at 447). Plaintiff stated that even though there was a measurable reduction in her pain due to the medication regimen, her pain control was not ideal, thereby limiting her functionality and mobility. *Id*.

### 3. Hearing Testimony

A hearing was held before the ALJ on August 16, 2007.[6] (Tr. at 488). Plaintiff, her counsel, a witness, two medical experts, and a vocational expert ("VE") attended the hearing. *Id*.

#### *a.    Plaintiff's Testimony*

Plaintiff was first questioned by the ALJ concerning an attempted suicide incident that occurred on the Sunday before the hearing, where Plaintiff allegedly overdosed on sleeping pills. (Tr. at 494). Plainitff testified that she lived with her husband, her 18-year-old son, her 24-year-old daughter, and her son-in-law in a two-bedroom house. (Tr. at 497-98). She stated that her daughter was pregnant and bipolar, and her son-in-law was unemployed. (Tr. at 498). As a result, she was living a chaotic life. *Id*.

Upon examination by the ALJ concerning her work history and daily activities, Plaintiff testified that she had previously worked as a medical records clerk, data entry clerk, and book-seller. (Tr. at 517-20). Plaintiff stated that her daughter was the main cook in the house, and that she herself cooked only if it did not require standing for long periods of time. (Tr. at 521). Plaintiff further testified that

---

[6] A hearing was to be held on May 31, 2007. (Tr. at 551). Plaintiff and her counsel arrived at the hearing and requested the ALJ for an extension to file and accelerate an application for Title II up to hearing. (Tr. at 556). The ALJ decided to postpone the hearing for 60 days based on Plaintiff's request. *Id*.

she had given up a lot of her previous hobbies, including roller skating, walking and bike-riding, because of her pain. (Tr. at 521-22). She could still read and play the clarinet a little bit, but her attempts to shop online for decoration purposes were not successful because of her inability to sit for more than twenty minutes. (Tr. at 522). Plaintiff also testified that despite her limited ability to drive, she tried not to because of the large quantity of medication that she was taking. (Tr. at 524-25). Concerning her sleeping habits, she testified that she slept on and off during the day, especially after a rough night, and she took sleep medication to help with her sleep. (Tr. at 523).

Upon re-examination by her counsel concerning her medical condition, Plaintiff testified that the left side of her lower back felt consistent and constant chronic pain that limited her ability to sit, stand, or move for long periods of time. (Tr. at 526-28). She also testified that stress caused her pain level to go up. (Tr. at 530). She identified depression ensuing from a year-long separation from her husband and subsequent child support problems in 1999, as one source of her stress. (Tr. at 530-31). Plaintiff stated that the work she did to support herself during that separation complicated her medical condition. (Tr. at 531).

### b. *Witness's Testimony*

Michael T. Josh Fuller, Plaintiff's husband, also testified at the hearing. Mr. Fuller stated that Plaintiff's injury to her back occurred before he separated from her in February of 1999. (Tr. at 534). Mr. Fuller testified that Plaintiff was in pain and that her daily activities, including her ability to stay on task, were diminished by her injury. (Tr. at 535). He noted, however, that her ability to concentrate was fairly good most of the time, even though it did seem to be getting worse with time. (Tr. at 537). He also noted that Plaintiff's pain had been pretty severe since her injury, although some days were better than others. *Id*. Mr. Fuller stated that stress exacerbated Plaintiff's pain and that he had noticed an increase in her pain level after he came back from their year long separation. (Tr. at 536).

### c. *Medical Experts' Testimony*

At the hearing, Dr. Sterling Moore testified as a medical expert. Upon examination by the ALJ, Dr. Moore stated that although Plaintiff's MRI scan was normal, her doctors had diagnosed sacroiliac joint dysfunction and lumbar spondylosis. (Tr. at 499). Dr. Moore further stated that a diagnosis for lumbar spondylosis could not be made without an x-ray detailing it, and that he found no such x-ray in Plainitff's medical record. *Id*. He testified that medical notes showed tenderness over Plaintiff's sacroiliac joint and lower back, and no change in her physical findings over time. (Tr. at 499-500). Dr. Moore noted that one of Plaintiff's medical reports stated that Waddell signs were positive without indicating what specific signs were tested. (Tr. at 500). He stated that Plaintiff had undergone a number of procedures, including epidural steroid injections, injections into the sacroiliac joint, and rhizotomies. *Id*. Dr. Moore classified functional limitations placed by Plaintiff's physical findings as severe and opined that she should be able to perform work at a light level. (Tr. at 500-01). He stated that Plainitff could stoop only occasionally and could not climb ladders, scaffolds and ropes. (Tr. at 501). Dr. Moore testified, however, that Plaintiff could squat, kneel, crouch, and crawl frequently, and that there were no environmental limitations. *Id*. Dr. Moore gave Plaintiff a "six each out of eight" (possibly referring to 6 hours out of an 8-hour work day) concerning her sitting, standing, and walking, but noted that it would be appropriate for her to alternate between different physical positions every thirty to sixty minutes. (Tr. at 501-02).

Upon re-examination by Plaintiff's attorney, Dr. Moore reiterated that he had noticed Waddell signs in the medical record and that they were valid. (Tr. at 504). He noted that Plaintiff had been on different pain medications for several years and that some of them were narcotic. *Id*. Dr. Moore testified that Plaintiff's functional capabilities were not reflected in the medical record. (Tr. at 508). When questioned about a medical report dated March 8, 2005, Dr. Moore testified that the report

showed some significant limitations in Plaintiff's lumbar range of motion because it was noted to be 42 degrees instead of the normal 90 degrees. (Tr. at 509). He also testified that as a result of these limitations, Plaintiff would be limited in stooping and would have to alternate between sitting, standing, or walking. (Tr. at 510-11). He further testified that Plaintiff would need to stay out of a particular physical position for three to five minutes or sometimes longer. (Tr. at 511).

Dr. Alvin Smith, another medical expert, also testified at the hearing. Upon examination by the ALJ, Dr. Smith stated that Plaintiff had been diagnosed with major depressive disorder and that her medical reports indicated severe anxiety and stress. (Tr. at 512). He testified that Plaintiff seemed to improve when she was placed on Prozac and Restoril, even though her family problems continued to be added stressors. (Tr. at 513). Dr. Smith stated that the record reflected mild, and not significant, limitations on Plaintiff's ability to consistently perform her daily activities. (Tr. at 514). He rated any social limitations placed on Plaintiff by her medical condition to be moderate. *Id*. Dr. Smith further testified that fairly chronic pain could be distracting and tended to affect a person's ability to concentrate and maintain pace. *Id*. He stated that Plaintiff's medical record at one point did reflect a decreased ability to concentrate, but the decrease was attributed to Plaintiff's depression rather than her pain. *Id*. He also stated that the medical evidence did not include any incidents of decompensation. *Id*. Dr. Smith concluded that based on the record as a whole, Plaintiff had the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, but only if the tasks were of a non-complex nature. (Tr. at 515-16). He added that Plaintiff would not have a problem working around supervisors, co-workers and the public, and that she might actually enjoy being away from home. (Tr. at 516).

### d.     *VE's Testimony*

Joyce Shoop, a VE, also testified at the hearing. She stated that Plaintiff's past relevant work

included her jobs as general clerk (light, semi-skilled, SVP of 3), receptionist (sedentary, semi-skilled, SVP of 4), sales-clerk (light, semi-skilled, SVP of 3), stock clerk (light, semi-skilled, SVP of 4), cashier/checker (light, semi-skilled, SVP of 3), newspaper distributor (light, unskilled), ad-layout/space clerk (sedentary, skilled, SVP of 5), and baby-sitter (medium, semi-skilled, SVP of 3). (Tr. at 539-40). She testified that the job of an office clerk, receptionist, retail clerk, or cashier would be in the sedentary and light range, and would involve a combination of walking, moving, standing and sitting. (Tr. at 540-41). At the hearing, the ALJ posited the following hypothetical question to the VE:

> hypothetical number one, an individual who is able to lift and carry 20 pounds occasionally, 10 pounds frequently; can sit, stand, or walk for six hours in an eight hour day with the requirement of being able to change positions every 30 to 60 minutes. In other words, require a sit, a sit/stand option while remaining at the workplace, would avoid frequent ascending and descending stairs, avoid pushing and pulling motions with the upper and lower extremities; has bilateral manual dexterity for both gross and fine manipulation; should be in a low stress, no-production oriented position not in close proximity to many co-workers, not in direct contact more than occasionally with the public, who, lets see if there is anything I want to add to that hypothetical. No. Would that individual be able to perform any of the past relevant work?

(Tr. at 543). The VE responded that such an individual could possibly work as a layout clerk but with some production limitations. *Id*. The ALJ then posited the same question but changed the job requirements to carrying and lifting ten pounds occasionally, less than ten pounds frequently, and rest periods of at least fifteen minutes every two hours in addition to a normal lunch. *Id*. The VE classified such a job as sedentary and opined that it included Plaintiff's past relevant work as an ad-layout clerk, provided that there were low production requirements for the job. (Tr. at 544). When the ALJ asked the VE to additionally assume a hypothetical person who tended to lose focus every two hours for ten to fifteen minutes, the VE opined that such a person would not be able to perform all of Plaintiff's past relevant work. *Id*. The VE also stated that based on all three hypotheticals, and Plaintiff's limited ability to perform production tasks, she may not be able to find any of her past relevant jobs in the

economy. (Tr. at 544-45). The VE added that Plaintiff might be able to find some other unskilled clerical jobs, such as those of a document preparer or photocopy clerk, depending on how low the production level of those unskilled jobs was. (Tr. at 545).

**C.    ALJ's Findings**

The ALJ issued her decision denying benefits on November 26, 2007. (Tr. at 15-23). In her findings, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability. (Tr. at 17, ¶2). The ALJ found that Plaintiff had the severe impairments of lumbar spondylosis with sacroiliac dysfunction, anxiety and depression, both secondary to her physical problems. (*Id.* at ¶3). However, the ALJ concluded that these medically determinable impairments did not meet or equal a listed impairment. (Tr. at 18, ¶4).

The ALJ also found that Plaintiff retained the Residual Functional Capacity ("RFC") to "frequently lift up to 20 pounds occasionally, 10 pounds frequently, sit 6 hours of an 8-hour workday, stand/walk 6 hours of an 8-hour workday, but should be able to change positions every 30-60 minutes, never climb ropes or ladders, occasionally use ramps/stairs, balance, stoop, kneel, crouch or crawl, frequently handle, finger, feel or reach; and she should avoid extreme heat or cold." (*Id.* at ¶ 5). The ALJ further found that Plaintiff "retains the ability to understand, remember and follow simple 1, 2, 3 step instructions and complete repetitive tasks, is capable of simple routine tasks, should avoid high production quotas/problem solving, has the ability to relate to supervisors or co-workers but not on a continual basis, has the ability to perform within a schedule and requires work with minimal interaction with co-workers/supervisors." *Id.*

The ALJ also found that Plaintiff could not perform any of her past relevant work, but based on her age, education, work experience and RFC, she could perform other jobs that existed in significant numbers in the national economy. (Tr. at 21-22, ¶¶ 6-10). Even though the ALJ found that

Plaintiff's RFC to perform the full range of light work was eroded by her limitations, she determined, based on the VE's testimony, that Plaintiff could still work as a document preparer. (Tr. at 22). Based on these findings, the ALJ concluded that Plaintiff was not disabled, as defined by the Social Security Act, from January 1, 2002, through the date of her decision. (*Id*. at ¶11).

## II. ANALYSIS

### A. Legal Standards

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, but less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of

disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d

at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). The burden of proof then returns to the claimant to rebut the Commissioner's showing. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.** **Issues for Review**

Plaintiff presents two issues for determination:

(1) The ALJ's Step 5 finding that Plaintiff can perform document preparer jobs existing in significant numbers in the national economy is unsupported by substantial evidence because the ALJ did not present a hypothetical question to the VE incorporating reasonably all disabilities of the Plaintiff recognized in the ALJ's RFC finding.[7]

(2) No evidence supports the ALJ's step 5 finding that document preparer jobs exist in significant numbers in the economy.

(Pl.'s Br. at 1).

**C.** **Issue Two: Significant Number of Jobs**

Plaintiff contends that the ALJ's finding that she can perform a significant number of jobs in

---

[7] The parties do not dispute that the hypothetical question failed to incorporate all of Plaintiff's limitations, specifically (1) her ability to understand, remember, and follow simple 1, 2, and 3 step instructions; (2) her ability to complete repetitive tasks; (3) her capability to complete simple routine tasks; and (4) her limited ability to deal with problem solving situations. (Pl.'s Br. at 8; Def. Br. at 6-7). Although the VE's testimony that Plaintiff could perform unskilled work might have reasonably incorporated these limitations, the law in this circuit is not settled as to whether unskilled work includes positions which require a reasoning level of 3. This Court need not decide this issue because, regardless of the outcome, the second issue for review would still be dispositive of this case.

the economy is not supported by substantial evidence. (Pl. Br. at 13-15).

At Step 5 of the sequential review process, it is the Commissioner's burden to show that a claimant is capable of performing other gainful employment in the national economy. *Greenspan*, 38 F.3d at 236; 20 C.F.R. § 404.1520(a)(4)(i). According to the Code of Federal Regulations, "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b). Jobs that are isolated and exist in only very limited numbers in relatively few locations outside of the region where a claimant lived would not qualify under this test. *Id*. Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987)).

In this case, the ALJ found that Plaintiff could perform work that existed in significant numbers in the national economy because her RFC enabled her to work as a document preparer. (Tr. at 22, ¶10). The ALJ did not identify any other jobs that Plaintiff could perform with her RFC. *See id*. Neither the ALJ's findings nor the transcript from the administrative hearing provide any information pertaining to how many document preparer jobs existed in either the state or national economy; the ALJ simply asserted that such jobs existed in significant numbers. (*See id*.; Tr. at 545). Defendant does not dispute that the ALJ failed to provide any evidence that a significant number of document preparer jobs existed in the state or national economy. (Def. Br. at 9-10; Pl. Reply at 1). Rather, he contends that Plaintiff failed to show how this finding prejudiced her, failed to raise this issue on cross-examination of the VE, and failed to offer any contradictory evidence. (Def. Br. at 10).

With regards to Defendant's first contention that Plaintiff filed to show prejudice, the ALJ violated the regulations governing the sequential disability determination process to show that Plaintiff

could perform work existing in significant numbers. 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1566(b). "Violation of a regulation constitutes error, and will constitute a basis for reversal of agency action and remand when a reviewing court concludes that the error is not harmless." *McNair v. Comm'r of Soc. Sec. Admin.*, 537 F.Supp.2d 823, 838 (N.D. Tex. 2008) (Ramirez, Mag.) (citations omitted). Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Id.*; *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003).[8] Plaintiff contends that the job of document preparer is antiquated and that there is a reasonable possibility that such jobs are rare, if they exist at all. (Pl. Reply at 4). As described in the Dictionary of Occupational Titles ("DOT"), the clerical job of document preparer "[p]repares documents, such as brochures, pamphlets, and catalogs, for microfilming." DOT #249.587-018, *available at* 1991 WL 672349 (G.P.O. 1991).[9] Given the growth in both automation and digital data storage, it is not apparent that clerical jobs involving an analog data storage system still exist in significant numbers in the state and national economy. Accordingly, it is conceivable that the number of jobs as a document preparer no longer exists in significant numbers as defined by defined by the Social Security regulations. The Court therefore finds

---

[8] A violation of a ruling, on the other hand, "may also constitute error warranting reversal and remand when an aggrieved claimant shows prejudice resulting from the violation." *McNair*, 537 F.Supp.2d at 838. Prejudice and harmless error analysis, although similar in substance, are different procedurally. *Id*. Remand for failure to comply with a ruling is appropriate only when a complainant affirmatively demonstrates ensuant prejudice. *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir.1981). A claimant establishes prejudice by showing that adherence to the ruling might have led to a different decision. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)).

[9] The full job description is listed as one who "[p]repares documents, such as brochures, pamphlets, and catalogs, for microfilming, using paper cutter, photocopying machine, rubber stamps, and other work devices: Cuts documents into individual pages of standard microfilming size and format when allowed by margin space, using paper cutter or razor knife. Reproduces document pages as necessary to improve clarity or to reduce one or more pages into single page of standard microfilming size, using photocopying machine. Stamps standard symbols on pages or inserts instruction cards between pages of material to notify MICROFILM-CAMERA OPERATOR (business ser.) 976.682-022 of special handling, such as manual repositioning, during microfilming. Prepares cover sheet and document folder for material and index card for company files indicating information, such as firm name and address, product category, and index code, to identify material. Inserts material to be filmed in document folder and files folder for processing according to index code and filming priority schedule." DOT #249.587-018, *available at* 1991 WL 672349.

that the ALJ's step 5 error was not harmless. *McNair*, 537 F.Supp.2d at 838.

As for Defendant's second and third contentions, that Plaintiff failed to raise the error on cross examination of the VE and failed to offer contradictory evidence, the burden rests with the Commissioner, not Plaintiff, at step 5. *Greenspan*, 38 F.3d at 236. In this case, the ALJ did not provide any estimate of the number of document preparer jobs in the state or national economy. Since it is conceivable that the number of document preparer jobs is no longer significant, the Commissioner did not meet his burden at step 5 and the burden of proof did not shift back to Plaintiff to refute the step 5 finding. *See Masterson*, 309 F.3d at 272. Defendant relies upon *Perez v. Barnhart* to support his second and third contentions. (Def. Br. at 10) (citing 415 F.3d 457, 464 (5th Cir. 2005)). *Perez* is distinguishable, however, because the ALJ in that case relied upon testimony from the VE that included figures for the number of jobs in the state and national economy for four different occupations that the claimant could perform with his RFC. 415 F.3d at 460. In this case, the VE did not provide any figures for the number of document preparer jobs in either the state or national economy, nor was there any testimony that Plaintiff could work in an occupation other than that of a document preparer. (*See* Tr. at 542-46). In other words, the ALJ in *Perez* met his step 5 burden; here, the ALJ did not.

For the reasons stated above, the Court finds a lack of substantial evidence to support the ALJ's step 5 finding that Plaintiff could perform other work existing in significant numbers. *Greenspan*, 38 F.3d at 236. Since the Commissioner did not meet his burden to show that Plaintiff is not disabled, remand is required.

## III. RECOMMENDATION

For the foregoing reasons, the Court recommends that Plaintiff's Motion for Summary Judgment be **GRANTED**, *Commissioner's Motion for Summary Judgment* be **DENIED**, the decision of the

Commissioner be **REVERSED,** and the case be **REMANDED** for reconsideration

On remand, the ALJ must provide evidence that Plaintiff is capable of performing other work existing in significant numbers.

**SO RECOMMENDED** on this 30th day of December, 2008.

*[signature]*
**IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE**

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985)*; Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

*[signature]*
**IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE**